HELVERING, COMMISSIONER OF INTERNAL REVENUE, v. ALABAMA ASPHALTIC LIMESTONE CO.

No. 328. Argued January 15, 1942.—Decided February 2, 1942.

*Assistant Attorney General Clark,* with whom *Solicitor General Fahy,* and *Messrs. J. Louis Monarch* and *Samuel H. Levy* were on the brief, for petitioner.

*Mr. James A. O'Callaghan* for respondent.

*Messrs. Walter J. Brobyn, Edgar J. Goodrich,* and *Neil Burkinshaw* filed a brief, as *amici curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent, in 1931, acquired all the assets of Alabama Rock Asphalt, Inc., pursuant to a reorganization plan consummated with the aid of the bankruptcy court. In computing its depreciation and depletion allowances for the year 1934, respondent treated its assets as having the same basis which they had in the hands of the old corporation. The Commissioner determined a deficiency, computed on the price paid at the bankruptcy sale.[1] The Board of Tax Appeals rejected the position of the Commissioner. 41 B. T. A. 324. The Circuit Court of Appeals affirmed. 119 F. 2d 819. We granted the petition for certiorari be-

---

[1] Petitioner now takes the position that the new basis should be measured by the market value of the assets rather than the bid price. See *Bondholders Committee* v. *Commissioner, post,* p. 189.

cause of the conflict between that decision [2] and *Commissioner* v. *Palm Springs Holding Corp.*, 119 F. 2d 846, decided by the Circuit Court of Appeals for the Ninth Circuit, and *Helvering* v. *New President Corp.*, 122 F. 2d 92, decided by the Circuit Court of Appeals for the Eighth Circuit.

The answer to the question [3] turns on the meaning of that part of § 112 (i) (1) of the Revenue Act of 1928 (45 Stat. 791, 818) which provides: "The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of . . . substantially all the properties of another corporation. . . ."

The essential facts can be stated briefly. The old corporation was a subsidiary of a corporation which was in receivership in 1929. Stockholders of the parent had financed the old corporation taking unsecured notes for their advances. Maturity of the notes was approaching and not all of the noteholders would agree to take stock for their claims. Accordingly, a creditors' committee was formed, late in 1929, and a plan of reorganization was proposed to which all the noteholders, except two, assented. The plan provided that a new corporation would be formed which would acquire all the assets of the old corporation. The stock of the new corporation, preferred and common, would be issued to the creditors in satisfaction of their claims. Pursuant to the plan, involuntary bankruptcy proceedings were instituted in 1930. The appraised value of the bankrupt corporation's assets was about $155,000. Its obligations were about $838,000, the unsecured notes with accrued interest aggregating somewhat over $793,000.

---

[2] And see *Commissioner* v. *Kitselman*, 89 F. 2d 458, and *Commissioner* v. *Newberry Lumber & Chemical Co.*, 94 F. 2d 447, which are in accord with the decision below.

[3] If there was a "reorganization," the respondent was entitled to use the asset basis of the old corporation as provided in § 113 (a) (7).

The bankruptcy trustee offered the assets for sale at public auction. They were bid in by the creditors' committee for $150,000. The price was paid by $15,000 in cash, by agreements of creditors to accept stock of a new corporation in full discharge of their claims, and by an offer of the committee to meet the various costs of administration, etc. Thereafter, respondent was formed and acquired all the assets of the bankrupt corporation. It does not appear whether the acquisition was directly from the old corporation on assignment of the bid or from the committee. Pursuant to the plan, respondent issued its stock to the creditors of the old corporation—over 95% to the noteholders and the balance to small creditors. Nonassenting creditors were paid in cash. Operations were not interrupted by the reorganization and were carried on subsequently by substantially the same persons as before.

From the *Pinellas* case (287 U. S. 462) to the *LeTulle* case (308 U. S. 415) it has been recognized that a transaction may not qualify as a "reorganization" under the various revenue acts though the literal language of the statute is satisfied. See Paul, Studies in Federal Taxation (3d Series), pp. 91 *et seq.* The *Pinellas* case introduced the continuity of interest theory to eliminate those transactions which had "no real semblance to a merger or consolidation" (287 U. S. p. 470) and to avoid a construction which "would make evasion of taxation very easy." *Id.* p. 469. In that case, the transferor received in exchange for its property cash and short term notes. This Court said (*id.* p. 470): "Certainly, we think that to be within the exemption the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes." In the *LeTulle* case, we held that the term of the obligation received by the seller was immaterial. "Where the consideration is wholly in the transferee's bonds, or

part cash and part such bonds, we think it cannot be said that the transferor retains any proprietary interest in the enterprise." 308 U. S. pp. 420–421. On the basis of the continuity of interest theory as explained in the *LeTulle* case, it is now earnestly contended that a substantial ownership interest in the transferee company must be retained by the holders of the ownership interest in the transferor. That view has been followed by some courts. *Commissioner* v. *Palm Springs Holding Corp., supra; Helvering* v. *New President Corp., supra.* Under that test, there was "no reorganization" in this case, since the old stockholders were eliminated by the plan, no portion whatever of their proprietary interest being preserved for them in the new corporation. And it is clear that the fact that the creditors were for the most part stockholders of the parent company does not bridge the gap. The equity interest in the parent is one step removed from the equity interest in the subsidiary. In any event, the stockholders of the parent were not granted participation in the plan *qua* stockholders.

We conclude, however, that it is immaterial that the transfer shifted the ownership of the equity in the property from the stockholders to the creditors of the old corporation. Plainly, the old continuity of interest was broken. Technically that did not occur in this proceeding until the judicial sale took place. For practical purposes, however, it took place not later than the time when the creditors took steps to enforce their demands against their insolvent debtor. In this case, that was the date of the institution of bankruptcy proceedings. From that time on, they had effective command over the disposition of the property. The full priority rule of *Northern Pacific Ry. Co.* v. *Boyd,* 228 U. S. 482, applies to proceedings in bankruptcy as well as to equity receiverships. *Case* v. *Los Angeles Lumber Products Co.,* 308 U. S. 106. It gives creditors, whether secured or unsecured, the right to ex-

clude stockholders entirely from the reorganization plan when the debtor is insolvent. See *In re 620 Church St. Bldg. Corp.,* 299 U. S. 24. When the equity owners are excluded and the old creditors become the stockholders of the new corporation, it conforms to realities to date their equity ownership from the time when they invoked the processes of the law to enforce their rights of full priority. At that time they stepped into the shoes of the old stockholders. The sale "did nothing but recognize officially what had before been true in fact." *Helvering* v. *New Haven & S. L. R. Co.,* 121 F. 2d 985, 987.

That conclusion involves no conflict with the principle of the *LeTulle* case. A bondholder interest in a solvent company plainly is not the equivalent of a proprietary interest, even though upon default the bondholders could retake the property transferred. The mere possibility of a proprietary interest is, of course, not its equivalent. But the determinative and controlling factors of the debtor's insolvency and an effective command by the creditors over the property were absent in the *LeTulle* case.

Nor are there any other considerations which prevent this transaction from qualifying as a "reorganization" within the meaning of the Act. The *Pinellas* case makes plain that "merger" and "consolidation" as used in the Act includes transactions which "are beyond the ordinary and commonly accepted meaning of those words." 287 U. S. p. 470. Insolvency reorganizations are within the family of financial readjustments embraced in those terms as used in this particular statute. Some contention, however, is made that this transaction did not meet the statutory standard because the properties acquired by the new corporation belonged at that time to the committee and not to the old corporation. That is true. Yet, the separate steps were integrated parts of a single scheme. Transitory phases of an arrangement frequently are dis-

regarded under these sections of the revenue acts where they add nothing of substance to the completed affair. *Gregory* v. *Helvering,* 293 U. S. 465; *Helvering* v. *Bashford,* 302 U. S. 454. Here they were no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan.

*Affirmed.*

MR. JUSTICE ROBERTS did not participate in the consideration or decision of this case.